**Slip Op. 02-150**

**United States Court of International Trade**

SAVE DOMESTIC OIL, INC.,

        Plaintiff,

        v.

UNITED STATES,

        Defendant,

        and

API AD HOC FREE TRADE COMMITTEE;
SAUDI ARABIAN OIL COMPANY;
PETROLEOS DE VENEZUELA, S.A. AND
CITGO PETROLEUM CORPORATION;
PETROLEOS MEXICANOS, P.M.I. COMERCIO
INTERNACIONAL S.A. DE C.V., AND
PEMEX EXPLORACION Y PRODUCCION;
CHEVRON CORPORATION; EXXON
CORPORATION; MOBIL CORPORATION;
SHELL OIL COMPANY; TEXACO INC.; AND
BP AMOCO,

        Defendants-Intervenors.

Before: Pogue, Judge

Court No. 99-09-00558

[Agency reconsideration pursuant to court remand sustained.]

Decided: December 17, 2002

Wiley Rein & Fielding LLP (Charles Owen Verrill, Jr., Timothy C. Brightbill) for Plaintiff Save Domestic Oil, Inc.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, A. David Lafer, Senior Trial Counsel, Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Robert J. Heilferty, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant United States.

Dewey Ballantine LLP (Harry Clark, John W. Bohn)for Defendant-Intervenor API Ad Hoc Free Trade Committee.

Shearman & Sterling (Thomas B. Wilner, Jeffrey M. Winton, Perry S. Bechky, Jeronimo Gomez del Campo) for Defendants-Intervenors Petroleos de Venezuela, S.A. and CITGO Petroleum Corporation.

White & Case LLP (Carolyn B. Lamm, Adams C. Lee, Frank J. Schweitzer)for Defendant-Intervenor Saudi Arabian Oil Company.

**OPINION**

**Pogue, Judge**: On September 19, 2000, in Save Domestic Oil, Inc. v. United States, 24 CIT __, 116 F. Supp. 2d 1324 (2000) ("SDO I"), this Court ordered the Department of Commerce ("Commerce") to reconsider its determination in Certain Crude Petroleum Oil Products from Iraq, Mexico, Saudi Arabia, and Venezuela, 64 Fed. Reg. 44,480 (Dep't Commerce Aug. 16, 1999) (dismissal of antidumping and countervailing duty petitions) ("Dismissal Determination").[1] The Dismissal Determination found that the antidumping and countervailing duty petitions filed by Save Domestic Oil, Inc. lacked sufficient industry support for initiation of antidumping and countervailing duty investigations.

The Court now reviews Commerce's Administrative Determination Pursuant to Court Instructions: Antidumping and Countervailing Duty Petitions on Certain Crude Petroleum Oil Products from Iraq, Mexico, Saudi Arabia, and Venezuela (Aug. 7, 2001) ("Remand

---

[1] Familiarity with the Court's earlier opinion is presumed.

Determination").[2]   Jurisdiction lies under 28 U.S.C. § 1581(c)
(2000).

## Standard of Review

Commerce's Remand Determination must be sustained unless it is
"arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law."   19 U.S.C. § 1516a(b)(1)(A).   This
deferential standard requires only that Commerce "articulate a
satisfactory explanation for its action including a 'rational
connection between the facts found and the choice made.'"  Motor
Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29,
43 (1983) (quoting Burlington Truck Lines, Inc. v. United States,
371 U.S. 156, 168 (1962)).

## Discussion

### I.   Interested-Party Status of the Independent Petroleum Association of America ("IPAA")

During Commerce's original inquiry, the IPAA expressed support
for the antidumping and countervailing duty petitions.   Commerce

---

[2] Plaintiff challenges only two aspects of Commerce's Remand
Determination.  See Comments of Save Domestic Oil, Inc. on
Department of Commerce Remand Determination Dated August 7, 2001
at 3, 15 ("SDO Remand Comments").  However, we also review the
agency decision in order to verify compliance with the Court's
instructions in SDO I.  This Court has "inherent power to
determine the effect of its judgments," as well as to enforce
them.  United States v. Hanover Ins. Co., 82 F.3d 1052, 1054
(Fed. Cir. 1996); Ammex, Inc. v. United States, 26 CIT __, __,
193 F. Supp. 2d 1325, 1328-29 (2002).

disregarded the IPAA's support, however, after concluding that the association did not qualify as an interested party because it had failed to demonstrate that a majority of its members were regional crude oil producers.  See Dep't of Commerce Mem. from Judith Wey Rudman to Richard Moreland, The Status of the Independent Petroleum Association of America as an Interested Party (Aug. 9, 1999), P.R. Doc. AD-251 (Venezuela).[3]  The agency stated that

> in order to be an interested party, one must be a member of the industry on behalf of which relief is being sought . . . . Thus, if only regional producers are members of the regional industry, only producers within the region qualify as interested parties.  Moreover, if only regional producers qualify as interested parties, then only an association of which a majority of members are regional producers may qualify as an interested party.

Id. at 2-3; see also 19 U.S.C. §§ 1671a(c)(4)(C), 1673a(c)(4)(C) (indicating that in the case of regional industries, Commerce shall calculate industry support "on the basis of production in the region."); 19 U.S.C. § 1677(9)(E) (defining an "interested party" as "a trade or business association a majority of whose members manufacture, produce, or wholesale a domestic like product in the United States").

---

[3] Citations to the administrative record include references to public documents from the original inquiry ("P.R. Doc."); proprietary documents from the original inquiry ("Prop. Doc."); public documents from the remand inquiry ("P.R. Rem. Doc."); and proprietary documents from the remand inquiry ("Prop. Rem. Doc.").  Citations to documents from the original inquiry also include either "AD" or "CVD" and the name of one of the four subject countries, indicating the administrative record in which the document is found.

The Court approved Commerce's analysis in SDO I, stating that Commerce had "properly required IPAA to prove the necessary connection to the regional domestic like product."  24 CIT at __, 116 F. Supp. 2d at 1339.  The Court also noted, however, that IPAA "may still be able to establish on remand that its members are regional producers."  Id.

In its Remand Determination, Commerce re-evaluated the IPAA's interested party status using the same analysis and additional data.  Commerce noted that

> [b]ecause the petitioner requested relief on behalf of a regional domestic industry, only an association for which a majority of its members are regional producers may qualify as an interested party. To satisfy this requirement, no less than 50 percent of the association's members must qualify as interested parties, i.e., regional crude-oil producers.

Remand Determ. at 5.  In order to assess whether IPAA met this requirement, Commerce compared a listing of all IPAA members that are producers of crude oil with a list obtained from the Energy Information Administration ("EIA") of all regional crude oil producers.  Where an IPAA member's name did not appear in the EIA list but a similar name did appear there, Commerce gave the IPAA the benefit of the doubt and counted that IPAA member as a regional oil producer.  See Remand Determ. at 5-6; Dep't of Commerce Mem. from Oil Team to Richard W. Moreland, Crude Oil from Four Countries: Counting the Support of an Association (Aug. 7, 2001), Prop. Rem. Doc. 3 ("IPAA Mem.").  Despite this conservative

approach, the comparison indicated that regional producers of crude oil do not form a majority of the IPAA's members, and therefore the IPAA did not qualify as an interested party.[4] Remand Determ. at 6; IPAA Mem. at 3.  As Commerce has  articulated a "rational connection between the facts found and the choice made," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (internal citations omitted), the Court finds Commerce's determination that IPAA is not an interested party to be in accordance with law.


## II.  Accounting for the Views of Labor

Where an antidumping or countervailing duty  petition "does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product," Commerce is directed to

> (i)   poll the industry or rely on other information in order to determine if there is support for the petition as required by sub-paragraph (A), or
>
> (ii)  if there is a large number of producers in the industry, [Commerce] may determine industry support for the petition by using any statistically valid sampling method to poll the industry.

19 U.S.C. §§ 1671a(c)(4)(D),  1673a(c)(4)(D).  When Commerce conducts such an industry poll, 19 C.F.R. § 351.203(e)(5) provides that the agency "will include unions, groups of workers, and trade

---

[4] Commerce noted, however, that it would count the support of IPAA members "in cases where an individual member that produced crude oil in the region either expressed an opinion on its own behalf or belonged to another association that qualified as an interested party."  Remand Determ. at 6.

or business associations."

In the initial inquiry preceding the Dismissal Determination, Commerce conducted a poll of the regional domestic oil industry to assess support for the Save Domestic Oil petitions, surveying each of the 410 largest producers in the region and 401 of the remaining producers in the region. See Dep't of Commerce Mem. from Industry Support Team to Richard W. Moreland, Calculation of Industry-Support Percentages at 2 (Aug. 9, 1999), P.R. Doc. AD-245 (Venezuela). Commerce did not, however, include workers' groups or unions in the poll.

Commerce received comments on the petition from the Paper, Allied Industrial, Chemical & Energy Workers International Union, AFL-CIO, CLC ("PACE"),[5] and the agency concluded that PACE was an interested party with respect to six companies at which the union represented workers employed in crude oil production in the region. See, e.g., Dep't of Commerce Mem. from Oil Team to Richard W. Moreland, Remand on Dismissal of Petitions for the Imposition of Antidumping and Countervailing Duties on Crude Oil from Iraq, Mexico, Saudi Arabia, and Venezuela: Counting the Support of Labor at 2-3 (Aug. 7, 2001), Prop. Rem. Doc. 1 ("Labor Mem."). However, due to the lack of production information for these six firms, Commerce was initially unable to determine what portion of the

_____

[5] PACE was the only labor union or group of workers to submit comments concerning the petitions. See Remand Determ. at 7.

industry the firms represented.[6]  Id.  Consequently, Commerce did not count the union's support for the petition.  Id.  With respect to four companies involved in transporting crude oil to refinery and shipping facilities, rather than in crude oil production, Commerce determined that PACE was not an interested party.  Id. Commerce did not otherwise attempt to ascertain the views of workers on Save Domestic Oil's petitions.

In SDO I, the Court noted that Commerce is required to account for the views of labor when assessing support for an antidumping or countervailing duty petition.[7]  The Court stated that although Commerce had polled the industry in accordance with 19 U.S.C. §§ 1671a(c)(4)(D) and 1673a(c)(4)(D) in order to assess support for the petitions, it had not "made any attempt to poll production workers at those particular firms, nor did it otherwise determine where labor stands vis-à-vis SDO's petition."  SDO I, 24 CIT at __, 116 F. Supp. 2d at 1340.  The Court further stated, "given that

---

[6] Title 19 U.S.C. §§ 1671a(c)(4)(A) and 1673a(c)(4)(A) express the requirements for industry support in terms of percentages of production of the domestic like product. Production information is therefore required in order to assign the appropriate weight to the support or opposition of an interested party.

[7] The Court stated that "[i]n enacting [the Uruguay Round Agreements Act], Congress also clearly indicated its intent that 'labor have equal voice with management in supporting or opposing the initiation of an investigation.'"  SDO I, 24 CIT at __, 116 F. Supp. 2d at 1339 (internal citations omitted).  The Court also noted the requirement of 19 C.F.R. § 351.203(e)(5) that Commerce's poll of an industry "will include unions, groups of workers, and trade or business associations."  Id. at 1340.

statute and the clear intent of Congress in enacting URAA, this court concludes that it was not in accordance with law for the agency to have failed to account at all for the views of labor in this case." SDO I, 24 CIT at __, 116 F. Supp. 2d at 1341.

In its Remand Determination, Commerce concluded that "due to the extraordinarily large number of crude-oil production workers in the United States, it would not be feasible to conduct a poll of these workers." Labor Mem. at 4. No party to the present action challenges this conclusion. Instead of conducting a poll, the agency sought to account for the views of labor by evaluating the comments from PACE. Commerce found that PACE represented approximately 320,000 workers in the United States and Canada, including 32,000 workers employed in the oil industry. Id. The agency concluded that "PACE is the principal labor union in the U.S. oil industry," and noted that "[t]here is no record evidence of any other union in the crude-oil industry." Remand Determ. at 7; see also Labor Mem. at 4 ("[I]t is evident that, while PACE may not be the only union representing oil workers (although there is no record evidence that there are other such unions), PACE is the principal vehicle for organized labor in the U.S. oil industry."). Commerce also indicated that among the 339,000 crude-oil industry workers in the United States, approximately four percent, or 13,560

workers, were union members or covered by union contracts.[8]  Labor Mem. at 4.

In evaluating PACE's comments, the agency first re-examined whether PACE was an interested party with respect to its representation of pipeline workers.  Commerce inquired whether the pipeline companies are "included in the 'industry engaged in the production in the United States of' crude petroleum oil."  Labor Mem. at 5.  Commerce found that the pipeline companies engaged in transportation of petroleum products, not in the production of crude oil products.  Id. at 6 ("[T]hese pipeline companies and the workers employed therein are part of a separate industry that solely services the crude-oil industry.").  Therefore, Commerce declined to count the views of PACE with respect to the four pipeline companies at which it represents workers.  Id.  No party challenges this determination.

Next, in order to account for PACE's support for the petitions, Commerce requested production data from the six companies in the region at which PACE represents crude oil production workers.  See Remand Determ. at 8; Labor Mem. at 7-12.  Five of these companies submitted data in response to the request, and Commerce relied on other record evidence concerning the sixth company.  Id.  Production at companies which had expressed no

---

[8] It does not appear that the agency definitively ascertained that these 13,560 union workers were represented by PACE.

opinion on the petitions was counted in support of the petition, while production at companies which had expressed opposition to the petition was neutralized, i.e., the union's support was considered offset by the company's opposition.  <u>See</u> Remand Determ. at 8-9; Labor Mem. at 10-12; <u>see also</u> 19 C.F.R. § 351.203(e)(3).

Commerce's efforts to count the support of PACE rectify its earlier "fail[ure] to account at all for the views of labor." <u>SDO I</u>, 24 CIT at ___, 116 F. Supp. 2d at 1341.[9]  The agency has complied with the Court's instructions in <u>SDO I</u>, and therefore we uphold this aspect of the Remand Determination.

## III. Lease Condensate

In the original inquiry, Commerce declined to reach the question of whether lease condensate was included in the scope of the petitions after concluding that in any case, the petitions lacked the requisite industry support.[10]  Dismissal Determ., 64 Fed.

_____

[9] As no party challenges the adequacy of Commerce's efforts to account for the views of workers in the Remand Determination, we do not reach the issue of Commerce's compliance with the requirement of its own regulations that "[i]n conducting a poll of the industry . . . [Commerce] will include unions, groups of workers, and trade or business associations."  19 C.F.R. 351.203(e)(5).

[10] As Commerce did not conduct an investigation, the agency did not promulgate a scope definition.  Rather, in both the Dismissal and Remand Determinations, Commerce adopted the scope delineated by the express language of the petitions.  <u>See</u> Dismissal Determ., 64 Fed. Reg. 44,480-81; Remand Determ. at 10. In the Dismissal Determination, the agency concluded that refined products could not be included within the scope, but declined to

Reg. at 44,480, 44,482. In SDO I, the Court noted that depending on whether lease condensate were included in or excluded from the crude oil product of different companies, Commerce could be required to adjust the production data relied upon in calculating industry support.[11] See 24 CIT at __, 116 F. Supp. 2d at 1342. The Court concluded, "[g]iven that this case must be remanded for reconsideration by the agency, decision of this issue may become necessary." Id.

In the Remand Determination, Commerce concluded that "lease condensate is included in the scope of the petitions and the subject merchandise." Remand Determ. at 12. In order to make its determination, Commerce looked first to the language of the petitions, which state that the subject merchandise is "all crude petroleum oils and oils obtained from bituminous minerals testing at, above or below 25 degrees A.P.I.,[12] as defined in the 1999

---

reach the question of whether lease condensate was included. 64 Fed. Reg. 44,481. This question has been addressed in the Remand Determination.

[11] The Court stated, "[f]or example, if, as SDO contends, lease condensates are not found in its members' domestic product, but prove to be a part of the product obtained domestically by Committee companies, then that part may have to be discounted in the opposition of those producers to the petition." SDO I, 24 CIT at __, 116 F. Supp. 2d at 1342.

[12] A.P.I. refers to the American Petroleum Institute. A.P.I. gravity "measures the weight of crude oil." Dep't of Commerce Mem. from Oil Team to Richard W. Moreland, Lease Condensate at 2 & n.6 (Aug. 7, 2001), P.R. Rem. Doc. 21 ("Lease Condensate Mem.").

Harmonized Tariff Schedule of the United States ("HTSUS"), subheadings 2709.00.10 and 2709.00.20." Petition for the Imposition of Antidumping and Countervailing Duties, vol. 1 at 8 (June 29, 1999), P.R. Doc. AD-2 (Venezuela); Remand Determ. at 10. As noted in the Remand Determination, "nothing in the petitioner's scope language, as it exists, explicitly excludes lease condensate nor did the petitioner ever revise its proposed scope language so as to exclude lease condensate." Remand Determ. at 10-11. The language of the petitions supports this analysis.

Second, Commerce asserted that once lease condensate and crude oil are commingled, it is "not possible to separately identify crude oil and lease condensate entering under the HTS[US] numbers stated in the scope of the petitions." Remand Determ. at 11. The United States Customs Service "does not attempt to separately measure that part of the commingled crude oil that is lease condensate," and therefore "any attempt to exclude lease condensate from the scope of the petitions would be unadministrable." Id.; Lease Condensate Mem. at 9; Dep't of Commerce Mem. to File from Oil Team, Conversation with U.S. Customs Regarding Lease Condensate (Nov. 17, 2000) P.R. Rem. Doc. 12 (stating that the Customs Service makes "no effort to measure the amount of lease condensate commingled with crude oil."). Plaintiff asserts that the percentage of lease condensate in a mixture may be ascertained through "simulated distillation or actual distillation." Letter

from Wiley, Rein & Fielding to William Daley, <u>Response to Commerce Department's July 15, 1999 Letter Requesting Clarification</u> at 6 (July 22, 1999) Prop. Doc. CVD-84 (Venezuela) ("Petitioner's July 22, 1999 Response"); <u>see also</u> SDO Remand Comments at 18.  However, Plaintiff points to no further evidence concerning the distillation test.  Consequently, based on the record on this issue, Commerce's assertion that an "attempt to exclude lease condensate . . . would be unadministrable" is reasonable.

Finally, Commerce evaluated the evidence of record.  The evidence indicates that both lease condensate and crude oil are mixtures of hydrocarbons.  Crude oil consists of a mixture of hydrocarbons with an A.P.I. gravity range of 12 to 45 degrees, and exists as a liquid in underground reservoirs.  Lease condensate consists of a mixture of hydrocarbons with an A.P.I. gravity range of 45 to 60 degrees, and exists as a gas in underground reservoirs, condensing into a liquid at atmospheric pressures.  <u>See</u> Lease Condensate Mem. at 1-2 & n.1 (citing Chi U. Ikoku, <u>Natural Gas Reservoir Engineering</u> 54-55 (1984)); Petitioner's July 22, 1999 Response at 3-4, Att. I-1 at 3, 5; SDO Remand Comments at 20-21. Crude oil and lease condensate are extracted together from wells and are often commingled.  <u>See</u> Letter from Shearman & Sterling to William Daley, Sec. of Commerce at 4 (July 20, 1999), P.R. Doc. AD-45 (Venezuela); Letter from Dewey Ballantine, LLP to William Daley, Sec. of Commerce at 6 (Aug. 6, 1999), P.R. Doc. AD-224 (Venezuela);

Lease Condensate Mem. at 1-2, 8-9; Remand Determ. at 11; see also William L. Leffler, Petroleum Refining for the Non-Technical Person 144-47 (2d ed. 1985) (cited in the Lease Condensate Mem.).[13]  When commingled with crude oil, lease condensate is imported under the two HTSUS subheadings named in the petitions, 2709.00.10 and 2709.00.20.[14]  See Remand Determ. at 11; Lease Condensate Mem. at 9 & n.47 (citing Dep't of Commerce Mem. to File from Oil Team, Conversation with U.S. Customs Regarding Lease Condensate (Nov. 17, 2000) P.R. Doc. 12.).  A "basic industry definition" of crude oil, promulgated by the EIA, includes lease condensate.  Remand Determ. at 11-12; see also Lease Condensate Mem. at 9 & n.49 (quoting EIA, 1 Petroleum Supply Annual 1998 167, DOE/EIA-0340(98)/1 (June 1999); EIA, U.S. Crude Oil, Natural Gas, and Natural Gas Liquids Reserves 1998 Annual Report 151, DOE/EIA-0216(98) (Dec. 1999); Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 195 (10th ed. 1997)).  Thus, the record contains evidence supporting Commerce's determination that lease condensate is part of the

_____

[13] The citation in the Lease Condensate Memorandum is "Petroleum Refining for the Non-Technical Person, Leffler (2d ed. 1979), at 144."  Lease Condensate Mem. at 2 n.2.  The second edition of this book was published in 1985, and the page citation in the Lease Condensate Memorandum corresponds to the pagination of the 1985 edition.  Consequently, the Court has relied on the 1985 edition  in this opinion.

[14] Commerce also noted that when lease condensate is imported separately and not commingled with other crude oil, it enters the United States under heading 2710.00.45.10 HTSUS (condensate derived wholly from natural gas).  See Lease Condensate Mem. at 5 n.24.

subject merchandise.

Commerce found that because lease condensate is included within the subject merchandise, it also forms part of the domestic like product. Remand Determ. at 12 ("[W]e find that a product that is included in the subject merchandise is clearly within the domestic like product. There has been no argument that lease condensate produced in the domestic market is not 'like' the lease condensate produced in a foreign market."). The agency further stated that even if lease condensate were not included in the subject merchandise, Commerce "would still find that it is a part of the domestic like product based on a like-product analysis." Id. Relying on the International Trade Commission's six like-product criteria,[15] Commerce concluded, first, that "there is no clear dividing line between crude oil and lease condensate;" rather, "crude oil is a spectrum, with gravities of crude oil at different points on the spectrum having different mixes of hydrocarbon compounds. Lease condensate is merely at the lighter end of this spectrum." Remand Determ. at 13; see also Letter from Dewey Ballantine, LLP to William Daley, Sec. of Commerce at 6, 8-9 (Aug. 6, 1999), P.R. Doc. AD-224; 1 Thomas O. Allen & Alan P.

---

[15] These criteria are (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) common manufacturing facilities; (5) customer or producer perceptions; and, where appropriate (6) price. See Remand Determ. at 13; NEC Corp. v. Dep't of Commerce, 22 CIT 1108, 1110, 36 F. Supp. 2d 380, 383 (1998).

Roberts, Production Operations: Well Completions, Workover, and Stimulation 43-44 (2d ed. 1982) (cited in the Lease Condensate Mem.); Leffler, supra, Petroleum Refining for the Non-Technical Person 6, 144-45. Commerce also found that "lease condensate is used in the production of many of the same end-products as very light crude oil and, to this extent, it is interchangeable with crude oil." Remand Determ. at 13; see also Lease Condensate Mem. at 12 ¶ 2. This conclusion may be inferred from record evidence indicating that a primary determinant of the end uses of any particular hydrocarbon mixture is its weight or API gravity: thus, compounds of similar weight or API gravities may be interchangeable. See Letter from Dewey Ballantine, LLP to William Daley, Sec. of Commerce at 9 (Aug. 6, 1999), P.R. Doc. AD-224 ("Refineries expect, take delivery of, and process 'crude oil' that consists of heavier and lighter components, including condensates. . . . [T]he expectation of the ultimate purchaser is a crude stream with a consistent relative gravity . . . Condensates within crude oil are processed by refineries to produce a range of products, the range dependent upon the relative proportions of lighter and heavier components."); Leffler, supra, Petroleum Refining for the Non-Technical Person 4-9, 15 fig.3-3, 23 (indicating that hydrocarbon mixtures of different weights have different end uses).

Additionally, Commerce found that lease condensate and crude oil may be similarly extracted, refined, and transported, and that

the commercial use for both crude oil and lease condensate is to refine it into various products. Remand Determ. at 13-14; Lease Condensate Mem. at 13 ¶¶ 4-5; Leffler, supra, at 147 ("The market for most of the oil patch production is refineries. . . . [M]ost of it moves in pipelines to the refinery centers. It has often been convenient and efficient to use the crude oil as a carrier for not only the condensate, but the natural gasoline and butane as well."). The agency also found that "the scale of the price difference between heavy crude oil and light crude oil is typically the same as the [scale of the] price difference between light crude oil and lease condensate." Remand Determ. at 14; Lease Condensate Mem. at 14 n.62 (citing 1997 import data showing average per-barrel prices of $15.00 for heavy crude oil, $19.00 for light crude oil, and $21.00 for lease condensate).

Finally, Commerce found that lease condensate is treated as part of crude oil in the normal course of business and in the domestic production data of the parties to the action. Remand Determ. at 14; see also Lease Condensate Mem. at 13 ¶ 5 & n.61 (stating that examination of public Securities and Exchange Commission filings indicates that producers include lease condensate production in their reported production figures, and also that producers included lease condensate in their responses to Commerce's production survey). As there was no record evidence that all companies did not treat lease condensate alike, Commerce

did not adjust the figures used to assess industry support for the petitions.

Plaintiff asserts that lease condensate is outside the scope of the petitions and that it is not part of the domestic like product.  See SDO Remand Comments at 16, 20.  Plaintiff claims that when construing the scope of the petitions, Commerce must be guided by Plaintiff's intent, which was to exclude lease condensate from the petitions' scope.  Id. at 16.

Commerce, however, has "inherent authority to define and clarify" the scope of an investigation.  See San Francisco Candle Co., Inc. v. United States, 26 CIT __, __, 206 F. Supp. 2d 1304, 1309 (2002) (citing Koyo Seiko Co., Ltd. v. United States, 17 CIT 1076, 1078, 834 F. Supp. 1401, 1403 (1993), aff'd, 31 F.3d 1177 (Fed. Cir. 1994)); see also Kern-Liebers USA, Inc. v. United States, 19 CIT 393, 396, 881 F. Supp. 618, 621 (1995) (internal citations omitted).  While Commerce is guided by the intent of the petition in exercising its discretion to define and clarify the scope of an investigation, see Minebea Co., Ltd. v. United States, 16 CIT 20, 22, 782 F. Supp. 117, 120 (1992), aff'd, 984 F.2d 1178 (Fed. Cir. 1993), the agency relies primarily on the language of the petition in order to ascertain the petitioner's intent and define the scope.  See 19 C.F.R. § 351.202(b)(5) (requiring the petition to contain "[a] detailed description of the subject merchandise that defines the requested scope of the investigation,

including the technical characteristics and uses of the merchandise"); SKF USA, Inc. v. United States, 15 CIT 152, 156, 762 F. Supp. 344, 348 (1991) ("When a question arises as to whether a particular product is within the scope of an investigation, the ITA first must determine whether the petition covers that product. If the petition is ambiguous, Commerce then examines additional documentary evidence."); Mitsubishi Elec. Corp. v. United States, 12 CIT 1025, 1047, 700 F. Supp. 538, 555 (1988), aff'd, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("The ITA has the authority to define and/or clarify what constitutes the subject merchandise to be investigated as set forth in the petition containing the intent of petitioner expressed in as specific and definite terms, descriptions, and language as reasonably expected of petitioner."). Ultimately, "[t]he responsibility to determine the proper scope of the investigation and of the antidumping order . . . is that of the Administration, not of the complainant before the agency." Mitsubishi Elec. Corp. v. United States, 898 F.2d 1577, 1582 (Fed. Cir. 1990).

In addition to its argument, noted earlier, that it is possible to determine the presence and amount of lease condensate in a blend of commingled crude oil and lease condensate, see SDO Remand Comments at 18, Plaintiff advances a number of factual arguments in support of its claims that lease condensate is neither within the scope of the petitions nor a part of the domestic like

product.  Plaintiff asserts, inter alia, that refiners "object to the blending of condensates with crude oil, because lease condensates force down refiners' posted prices," id.; that production figures for lease condensate are reported separately by producers, id. at 19; and that lease condensate, which condenses naturally into a liquid as a result of pressure changes, is not recovered from bituminous minerals in the same manner as crude oil, which exists as a liquid.  Id. at 15-16, 19; see also Lease Condensate Mem. at 1-2, 11 & n.55.  Finally, Plaintiff points out that the New York Mercantile Exchange excludes lease condensates from its definition of crude petroleum.[16]  See SDO Remand Comments at 17 (citing MERC Rule 200.02).  Commerce considered Plaintiff's arguments during the investigation.  See Lease Condensate Mem. at 10-11.

It is long established that the possibility of drawing two inconsistent conclusions from the same evidence does not mean that the agency's finding is unsupported by substantial evidence.  See Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Furthermore, this Court "may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting

---

[16] The Mercantile Exchange rule appears to define crude oil for the purpose of a particular type of contract.  The definition stated in the rule does not appear to be a general industry definition.  See SDO Remand Comments at 17 (quoting MERC Rule 200.02 as defining "Crude Oil as used herein" and "[f]or purposes of this contract.").

views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" Timken Co. v. United States, 26 CIT __, __, 201 F. Supp. 2d 1316, 1319-20 (2002) (quoting Am. Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984)).  In this case, record evidence supports Commerce's conclusions and its decision to include lease condensates in the subject merchandise and the domestic like product.  See supra text at pp. 12-18.  As Commerce's decision is supported by substantial evidence on the record, the Court cannot find that the agency's decision is arbitrary, capricious, or an abuse of discretion.

**IV.  Treatment of Domestic Producers Alleged to be Related to Foreign Producers**

Title 19 U.S.C. §§ 1671a(c)(4)(B)(i) and 1673a(c)(4)(B)(i) state that "the administering authority shall disregard the position of domestic producers who oppose the petition, if such producers are related to foreign producers . . . unless such domestic producers demonstrate that their interests as domestic producers would be adversely affected by the imposition of a [countervailing duty or antidumping duty] order."

In its original inquiry, Commerce concluded that because the antidumping or countervailing duty orders would adversely affect the opposing parties in their capacities as domestic producers, it would include them in the definition of the domestic industry and

count their opposition to the petitions.[17]  See Dismissal Determ., 64 Fed. Reg. at 44,482.  In so doing, Commerce omitted to make the threshold determination required by the statute: whether the opposing parties were in fact related to foreign producers of the subject merchandise, as the petitioner alleged.  See 19 U.S.C. §§ 1671a(c)(4)(B)(i), 1673a(c)(4)(B)(i).

In SDO I, the Court noted that whether parties are related for the purpose of the statute depends on whether there exists a controlling relationship.  SDO I, 24 CIT at __, 116 F. Supp. 2d at 1333 (citing 19 U.S.C. § 1677(4)(B)(ii)).  The Court concluded that Commerce had erred in proceeding to evaluate whether the antidumping and countervailing duty orders would adversely affect domestic producers without first finding controlling relationships between the domestic producers and the foreign producers implicated in the petition.  Id. at 1333-34.

In its Remand Determination, Commerce declined to investigate this issue further on the ground that the Court had examined the record in SDO I and found that, "while the record reflected relationships in certain instances," the record evidence did not

---

[17] The parties opposing the petitions consisted of twenty domestic producers that submitted letters of opposition to Commerce, and other companies whose opposition to the petitions was discovered through the poll conducted by Commerce.  See Dismissal Determ., 64 Fed. Reg. at 44,481-82.  Commerce focused its analysis on the API Ad Hoc Free Trade Committee because "it is composed of the largest U.S. producers in opposition to the petitions and because its treatment is dispositive of the industry support issue."  Id. at 44,482.

establish controlling relationships between the foreign and domestic producers. Remand Determ. at 15-16 (citing SDO I, 24 CIT at __, 116 F. Supp. 2d at 1333-34). We agree that absent evidence of controlling relationships that would qualify parties as "related," Commerce was not required to further assess whether antidumping or countervailing duty orders would adversely affect the opposing firms in their capacities as domestic producers. Id.; see also 19 U.S.C. §§ 1671a(c)(4)(B)(i), 1673a(c)(4)(B)(i); 19 U.S.C. § 1677(4)(B)(ii).


**V.   Treatment of Opposing Domestic Producers That Import the Subject Merchandise**

Title 19 U.S.C. §§ 1671a(c)(4)(B)(ii) and 1673a(c)(4)(B)(ii) provide that Commerce "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise." In its original inquiry, Commerce decided to count the opposition of the members of the API Ad Hoc Free Trade Committee on the grounds that "the Committee and other opposing companies have demonstrated that their interests as domestic producers would be adversely affected by the imposition of an antidumping or countervailing duty order." Dismissal Determ., 64 Fed. Reg. at 44,482. In arriving at this decision, Commerce considered the Committee members collectively, rather than individually.

In SDO I, the Court indicated that Commerce must assess each

member company individually, and could include a company in the definition of the domestic industry only where the company had a "common stake" with the petitioners in the investigation.  See SDO I, 24 CIT at __, 116 F. Supp. 2d at 1335-39.  The Court stated that whether a firm may "have its opposition to a petition for imposition of antidumping or countervailing duties counted necessarily entails ITA consideration of that firm's level of imports and resultant dependency thereon.  For the agency not to have administered its test on an individual basis was an abuse of its discretion."  SDO I, 24 CIT at __, 116 F. Supp. 2d at 1339.  The Court also noted that "Commerce will not apply a bright line test to determine whether a producer who is an importer of the subject merchandise . . . should be excluded from the domestic industry.  Instead, it will look to relevant factors, such as percentage of ownership or volume of imports."  SDO I, 24 CIT at __, 116 F. Supp. 2d at 1337 (quoting the Statement of Administrative Action, Pub. L. No. 103-465 (1994)).[18]

In its Remand Determination, Commerce concluded that due to the prevalence of importing in the domestic crude oil industry, "it

---

[18] The Statement of Administrative Action, Pub. L. No. 103-465 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA"), accompanying the U.S. implementing legislation for the Uruguay Round Agreements, is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

is inappropriate to disregard the opposition of importers without regard to factors other than the relative level of imports." Remand Determ. at 21-22. The agency noted that "the United States as a whole imports 56 percent of its crude-oil consumption needs," and "[t]he region identified in the crude-oil petitions" imports sixty-five percent of its crude-oil needs. Id. at 20-21. Commerce also noted that "regional imports of oil are 184 percent of regional oil production." Id. at 21.

Thus, in order to assess whether a company had a "common stake" with the petitioner, Commerce (1) established four benchmark levels of imports for gauging import dependency,[19] and (2) looked to volume of production and production-related factors including the number of workers employed, the number of new oil wells drilled, the number of wells in operation, and oil field-related capital expenditures. Remand Determ. at 18-19, 22. Commerce evaluated each API Ad Hoc Free Trade Committee member's stake as a producer in the domestic industry by compiling data on each company's level of imports from Iraq, Mexico, Saudi Arabia, and Venezuela, and on each company's domestic production, as measured by the factors above. Id. The agency then balanced each company's level of import dependency against its stake in the domestic

---

[19] The four levels of import dependency are (1) no imports of subject merchandise, (2) imports of up to fifty percent of production, (3) imports between fifty and one hundred percent of production, and (4) imports greater than one hundred percent of production. Remand Determ. at 22.

industry to determine "whether, despite the import dependency, they have a common stake that justifies counting the company's opposition to the petition."  Id. at 18, 22-23.

Plaintiff contends that Commerce erred by departing from the procedures used in Frozen Concentrated Orange Juice from Brazil, 52 Fed. Reg. 8,324 (Dep't Commerce 1987) (final determ. of sales at less than fair value) ("FCOJ") and upheld by this court in Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 704 F. Supp. 1075 (1988).  See SDO Remand Comments at 3-5.  In FCOJ, Commerce disregarded the opposition of domestic producers that imported more than fifty percent of their total production from the subject country.  52 Fed. Reg. at 8,326.  Plaintiff claims that Commerce should have applied the fifty percent rule of FCOJ, and, pointing to three subsequent determinations, asserts that Commerce has consistently discounted the opposition of domestic producers that also import the subject merchandise.  See SDO Remand Comments at 3-5; see also Citric Acid and Sodium Citrate from the People's Republic of China, 65 Fed. Reg. 1,588 (Dep't Commerce 2000) (initiation of antidumping investigation); Live Cattle from Canada and Mexico, 63 Fed. Reg. 71,886 (Dep't Commerce 1998) (initiation of antidumping investigations); Ball Bearings and Parts Thereof from Thailand, 61 Fed. Reg. 20,799 (Dep't Commerce 1996) (final results of changed circumstances review and revocation of countervailing duty order).  Plaintiff asserts that Commerce's

decision not to apply the fifty-percent rule of FCOJ and to include producers that import higher percentages of their total production is an unjustified departure from the agency's prior practice. See SDO Remand Comments at 4-5, 8-15.

As noted by this Court in Citrosuco Paulista, "Congress entrusted Commerce with discretion to administer the international trade laws." 12 CIT at 1206, 704 F. Supp. at 1086. The language of the relevant statute plainly leaves to Commerce's discretion the decision whether to exclude producers that are also importers from the domestic industry. See 19 U.S.C. §§ 1671a(c)(4)(B)(ii), 1673a(c)(4)(B)(ii). As noted above, the SAA provides that "Commerce will not apply a bright line test to determine whether a producer who is an importer of the subject merchandise . . . should be excluded from the domestic industry. Instead, it will look to relevant factors, such as percentage of ownership or volume of imports." SAA, Pub. L. No. 103-465 at 858.

Commerce distinguished its earlier decision in FCOJ from the instant case on the basis of the relative dependency of the two industries on imports. In FCOJ, the agency noted that "significant levels of imports are . . . normal," and for that reason permitted imports up to fifty percent of production. 52 Fed. Reg. at 8,326. In the instant case, after noting that imports in the crude oil industry form an even more critical portion of the industry's supply, Commerce permitted the inclusion of producers that import

more than fifty percent of their total production from the subject countries.

Given the extremely high level of import dependency in the regional crude oil industry, Commerce could reasonably conclude that limiting the definition of domestic producers to those companies that import no more than fifty percent of their production would result in an excessively limited definition of the domestic industry that would fail to account for the variety of positions and views among producers. Commerce's use of import dependency benchmarks and consideration of other factors (such as the number of workers employed, the number of new oil wells drilled, the number of wells in operation, and oil field-related capital expenditures) to measure a company's stake in the domestic industry represents an effort to adequately account for the particular characteristics of the regional domestic crude oil industry.

Although Commerce has previously disregarded the opposition of importers, the earlier determinations do not establish a prior practice requiring Commerce to disregard the opposition of importers in all cases, or even in cases in which imports constitute more than fifty percent of production. Rather, the determinations to which Plaintiff directs the Court indicate that Commerce's decisions to exclude domestic producers that are also importers have been based on the particular circumstances of the

industries involved.  For example, Plaintiff directs the Court's attention to Live Cattle from Canada and Mexico, in which Commerce disregarded the opposition of the Texas Cattle Feeders Association ("TCFA") because approximately half of the TCFA's members were importers or handlers of Mexican cattle.  See Live Cattle from Canada and Mexico, 63 Fed. Reg. 71,886 (Dep't Commerce 1998)(initiation of antidumping investigations); Dep't of Commerce Mem. from Susan Kuhbach and Gary Taverman to Richard W. Moreland, Petitions on Live Cattle from Canada and Mexico: Determination of Industry Support at 19 (Dec. 22, 1998) ("Live Cattle Mem.").  The record evidence demonstrated that "approximately 85 percent of the live cattle imported from Mexico [were] destined for Texas feedlots or backgrounder operations;" that "approximately 100 of the 200 members of the TCFA handle[d] or [fed] Mexican cattle;" and that "Mexican imports account[ed] for a significant percentage of the cattle inventory of individual members of TCFA."  Live Cattle Mem. at 19.  Although Plaintiff states that this decision involved "producers who imported only 10-15 percent of their inventory," SDO Remand Comments at 4, the 10-15 percent figure, obtained from a newspaper article, applies to only one producer.  See Live Cattle Mem. at 19 n.39.  The actual percentage of TCFA members' inventory accounted for by imports is unclear.  See id. at 19.

     Live Cattle may be distinguished from the instant case because the Mexican cattle imports at issue constituted only a small

percentage of the domestic industry's total inventory, and the TCFA constituted only a small portion of the domestic industry.  See, e.g., Live Cattle Mem. at App. 10, 12.  Consequently, the exclusion of the importers from the domestic industry in Live Cattle did not result in the exclusion of a large proportion of producers.  In the instant case, by contrast, the industry in question demonstrates extensive import dependency.  See Remand Determ. at 20-21 (indicating that the region imports 65 percent of its consumption needs, and that "regional oil imports are 184 percent of regional production").  Domestic producers that are also importers of the subject merchandise account for a larger proportion of both the total domestic production and the opposition to the petitions.  See, e.g., Remand Determ. at Annex I, II (describing the production and import levels of the domestic producers that also import crude oil from the subject countries); id. at 39 (indicating which companies' opposition was disregarded with respect to each subject country); Dep't of Commerce Mem. from Oil Team to Laurie Parkhill, Crude Oil from Four Countries: Recalculation of Industry Support (Aug. 7, 2001), Prop. Rem. Doc. 2 (indicating, for each of the 410 companies surveyed by Commerce, the companies' production levels and their support or opposition for the petitions with respect to each subject country).  Consequently, excluding domestic producers that are also importers results in the exclusion of a greater proportion of the domestic industry than in Live Cattle.  Such a

pattern of exclusion may distort the results of Commerce's
investigation of industry support.  Moreover, here, Commerce did
not focus only on import dependency, but also analyzed other
factors in order to evaluate industry participants' stakes in the
domestic industry.  Therefore, Commerce's decision to include the
opposition of some domestic producers that are also importers was
reasonable under the particular facts and circumstances of this
case.[20]  As noted above, such case-by-case determinations are in

---

[20] Plaintiff also points to <u>Citric Acid and Sodium Citrate</u>
<u>from the People's Republic of China</u>, 65 Fed. Reg. 1,588 (Dep't
Commerce 2000) (initiation of antidumping investigation), in
which Commerce disregarded the opposition of one company that was
"a major purchaser and user of domestic and imported citric acid
and sodium citrate."  65 Fed. Reg. at 1,589.  However, this
determination contains no details of the company's import
dependence; moreover, Commerce acknowledged that even if this
company's opposition were considered, the petition had the
support of more than fifty percent of the domestic industry.
       Finally, Plaintiff points to <u>Ball Bearings and Parts Thereof</u>
<u>from Thailand</u>, 61 Fed. Reg. 20,799 (Dep't Commerce 1996) (final
results of changed circumstances review and revocation of
countervailing duty order).  In this case, Commerce disregarded
the opposition of companies that were related to foreign
producers of the subject merchandise. Commerce stated in the
determination that

> The Objecting Parties have made it clear that their
> interest in this order is neither aligned with that of
> the petitioner nor made in their capacity as domestic
> producers.  Thus, the Objecting Parties cannot be said to
> have a common "stake" with the petitioner in the relief
> provided by the order.  As such, we do not consider the
> Objecting Parties to be domestic producers for the
> purposes of section 782(h)(2) of the Act or section
> 355.25(d)(1)(i) of our regulations.

61 Fed. Reg. at 20,801.  Thus, the basis for the exclusion was
not import dependency.  Commerce did not consider whether the
objecting companies were also importers of the subject

accordance with the statute and the SAA.  Commerce may adapt its views and practices to the particular circumstances of the case at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record.  See, e.g., Motor Vehicles Mfrs. Ass'n, 463 U.S. at 42-43; Asociacion Colombiana de Exportadores de Flores v. United States, 22 CIT 173, 184-85, 6 F. Supp. 2d 865, 879-80 (1998) ("Commerce has the flexibility to change its position providing that it explain the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence.").  Here, Commerce's reliance on other factors to find a sufficient stake in the domestic industry is within the scope of the exercise of reasonable discretion.

Finally, even if prior determinations were interpreted to establish a consistent prior practice of excluding importers from the domestic industry, Commerce has provided sufficient reasoning to justify its departure from that practice.  Commerce has indicated that its decision to include producers that import more than fifty percent of their production was based on the particular significance of imports in the regional domestic industry.  See Remand Determ. at 20-23.  The agency compiled and analyzed data on the relevant characteristics of the domestic crude oil industry and

---

merchandise.

on the individual companies, balancing each company's level of import dependency against its stake in the domestic industry to determine which producers had a "common stake" with petitioners. See Remand Determ. at 18. In so doing, Commerce complied with the Court's instructions in SDO I to consider each company's circumstances individually prior to including it in or excluding it from the domestic industry, and to eschew a bright line test in favor of "look[ing] to relevant factors, such as percentage of ownership or volume of imports." SDO I, 24 CIT at __, 116 F. Supp. 2d at 1337 (internal citations omitted).

The record here demonstrates that Commerce has "articulate[d] a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. Accordingly, this Court cannot find that Commerce's process or decision was arbitrary, capricious, or an abuse of discretion.

## VI.  Comments of Secretary Evans

Plaintiff alleges that Commerce's dismissal of its petitions was predetermined due to the opposition to the petitions of Secretary of Commerce Donald Evans. See SDO Remand Comments at 2. While such an allegation is troubling, neither the allegation nor evidence to support it are found in the record. Absent an attempt to obtain discovery or otherwise establish an appropriate record, the allegation is not properly before the Court in its review of

the Remand Determination, and cannot be considered.  See, e.g., Alloy Piping Prods., Inc. v. United States, 26 CIT __, __, 201 F. Supp. 2d 1267, 1279 (2002) (stating that judicial review is "limited to the evidence contained in the administrative record") (citing Kerr-McGee Chem. Corp. v. United States, 21 CIT 11, 18-19, 955 F. Supp. 1466, 1472 (1997)); Koyo Seiko Co., Ltd. v. United States, 21 CIT 146, 158 & n.9, 955 F. Supp. 1532, 1544 & n.9 (1997) ("The Court's review of a final determination is limited to a review of the administrative record.").

## Conclusion

For the reasons stated above, Commerce's Remand Determination in Save Domestic Oil, Inc. v. United States, 24 CIT __, 116 F. Supp. 2d 1324 (2000), is affirmed in its entirety.

_____
Donald C. Pogue
Judge

Dated:    December 17, 2002
          New York, New York

```
SAVE DOMESTIC OIL, INC.,

              Plaintiff,

       v.

UNITED STATES,

              Defendant,

       and                              Before: Pogue, Judge

API AD HOC FREE TRADE COMMITTEE;        Court No. 99-09-00558
SAUDI ARABIAN OIL COMPANY;
PETROLEOS DE VENEZUELA, S.A. AND
CITGO PETROLEUM CORPORATION;
PETROLEOS MEXICANOS, P.M.I. COMERCIO
INTERNACIONAL S.A. DE C.V., AND
PEMEX EXPLORACION Y PRODUCCION;
CHEVRON CORPORATION; EXXON
CORPORATION; MOBIL CORPORATION;
SHELL OIL COMPANY; TEXACO INC.; AND
BP AMOCO,

              Defendants-Intervenors.
```

## Judgment

This action has been duly submitted for decision, and this Court, after due deliberation, has rendered a decision herein; now, in conformity with that decision, it is hereby

ORDERED that the Department of Commerce's <u>Administrative Determination Pursuant to Court Instructions: Antidumping and Countervailing Duty Petitions on Certain Crude Petroleum Oil Products from Iraq, Mexico, Saudi Arabia, and Venezuela</u> (Aug. 7, 2001) is sustained in its entirety.


_____
Donald C. Pogue
Judge


Dated:     December 17, 2002
           New York, New York