357 F.3d 1278
 SAVE DOMESTIC OIL, INC., Plaintiff-Appellant,
v.
UNITED STATES, and
API Ad Hoc Free Trade Committee, and
Saudi Arabian Oil Company, and
Petroleos De Venezuela, S.A. and Citgo Petroleum Corporation, and
Petroleos Mexicanos, P.M.I. Comercio Internacional S.A. De C.V., and Pemex Exploracion y Produccion, and
BP Amoco and BP America, Inc. (now known as BP Corporation North America Inc.), Defendants-Appellees, and
Chevron Corporation and Texaco Inc. (now known as ChevronTexaco Corporation), Exxon Corporation and Mobil Corporation (now known as Exxon-Mobil Corporation), and Shell Oil Company, Defendants.
 No. 03-1262.
 United States Court of Appeals, Federal Circuit.
 DECIDED: January 30, 2004.
 
 Charles Owen Verrill, Jr., Wiley Rein & Fielding LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Timothy C. Brightbill. Of counsel was Daniel B. Pickard.
 Michael D. Panzera, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief was David M. Cohen, Director. Of counsel on the brief was Jonathan Engler, Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC. Of counsel were Berniece A. Browne and John D. McInerney, Attorneys, United States Department of Commerce, of Washington, DC.
 Harry L. Clark, Dewey Ballantine LLP, of Washington, DC, argued for defendant-appellee API Ad Hoc Free Trade Committee. With him on the brief were John W. Bohn and David A. Yocis. Of counsel was Bradford L. Ward.
 Carolyn B. Lamm, White & Case LLP, of Washington, DC, for defendant-appellee Saudi Arabian Oil Company. With her on the brief were Adams C. Lee, and Frank J. Schweitzer. Of counsel was Frank H. Morgan and Francis A. Vasquez, Jr.
 Thomas B. Wilner, Shearman & Sterling LLP, of Washington, DC, for defendants-appellees Petroleos De Venezuela, S.A., et al. Company. With him on the brief were Perry S. Bechky and Christopher M. Ryan. Of counsel was Kristine Huskey.
 Lynn Marie Fischer, Wilmer, Cutler & Pickering, of Washington, DC, for defendants-appellees Petroleos Mexicanos, et al. With her on the brief were Gary N. Horlick and Peggy A. Clarke. Of counsel was John P. Maloney, Jr.
 Robert E. Burke, Barnes, Richardson & Colburn, of Chicago, Illinois, for defendant-appellee BP Corporation North America, Inc. With him on the brief were Brian F. Walsh, Diane A. MacDonald, and Jane E. Welsh.
 Before RADER, BRYSON, and PROST, Circuit Judges.
 PROST, Circuit Judge.
 
 
 1
 Save Domestic Oil, Inc. ("SDO") appeals from a decision of the United States Court of International Trade dismissing its case and upholding the United States Department of Commerce's ("Commerce's") refusal to initiate countervailing duty ("CVD") and antidumping duty ("AD") investigations into crude oil imports from Iraq, Mexico, Saudi Arabia, and Venezuela. Save Domestic Oil, Inc. v. United States, 240 F.Supp.2d 1342 (Ct. Int'l Trade 2002). Because we agree with the Court of International Trade that Commerce properly considered the opposition of domestic importer-producers in determining whether the petitions had the requisite industry support, we affirm.
 
 
 2
 * On June 29, 1999, SDO, a consortium of twelve U.S. crude oil producers, filed eight separate petitions seeking the imposition of CVD and AD upon crude petroleum oil products imported from Iraq, Mexico, Saudi Arabia, and Venezuela.[1]
 
 
 3
 On August 9, 1999, Commerce dismissed SDO's petitions for lack of industry support. Certain Crude Petroleum Oil Products From Iraq, Mexico, Saudi Arabia, and Venezuela, 64 Fed. Reg. 44,480 (Dep't Commerce Aug. 16, 1999) (publishing Dismissal of Antidumping and Countervailing Duty Petitions, dated Aug. 9, 1999) ("Dismissal Determination"). In particular, Commerce dismissed the petitions because many of the large, integrated oil companies (e.g., Exxon, Texaco), sixteen of which joined to form the API[2] Ad Hoc Free Trade Committee ("API"), opposed the petition. API presented expert testimony that the imposition of duties would adversely affect its members as domestic producers (both as related to foreign producers and as importers) by lowering production, creating price instability, and reducing the diversity of oil supplies. Consequently, in determining the amount of support for the petitions, Commerce counted the opposition of the API members. Because approximately 67% of the regional domestic industry opposed the imposition of duties, Commerce dismissed SDO's petitions.
 
 
 4
 SDO appealed Commerce's decision to the Court of International Trade. On September 19, 2000, the court held, inter alia, that Commerce should have applied a "common stake" analysis with respect to the importing domestic producers, comparing each individual producer's import dependency to its stake in the domestic industry. Save Domestic Oil, Inc. v. United States, 116 F.Supp.2d 1324 (Ct. Int'l Trade 2000). The Court of International Trade therefore remanded the case to Commerce.
 
 
 5
 On August 7, 2001, Commerce upheld its original dismissal, again considering the opposition of the integrated oil producers. Administrative Determination Pursuant To Court Instructions: Antidumping and Countervailing Duty Petitions on Certain Crude Petroleum Oil Products from Iraq, Mexico, Saudi Arabia, and Venezuela (Dep't Commerce Aug. 7, 2001) ("Remand Determination"). In particular, Commerce considered the opposition of ARCO, BP-Amoco, Coastal, Chevron, Conoco, Exxon, Fina, Marathon, Mobil, Murphy, Phillips Petroleum, Shell, and Texaco. See id. at 29 n. 49. Applying the "common stake" analysis as dictated by the Court of International Trade, Commerce developed a matrix to compare each company's dependency on imports (none, low, significant, high) to its stake in domestic production (based on factors such as production volume, number of workers, number of new wells drilled, number of wells in operation, oil-field-related capital expenditures, and reserve holdings). See id. at 18-19, 22. Performing the analysis on a company and country-specific basis, Commerce determined whether it would disregard a company's opposition to a country-specific petition. Id. at 39. In the end, Commerce concluded that approximately 60% of the domestic industry opposed SDO's various petitions. It therefore dismissed the petitions. Id. at 40.
 
 
 6
 SDO again appealed to the Court of International Trade. The court, however, upheld Commerce's dismissal, finding that Commerce did not have to disregard the opposition of domestic importer-producers because it found that the opposition arose out of the producers' domestic interests. Save Domestic Oil, 240 F.Supp.2d at 1353-57. In particular, the court found that the high level of U.S. dependency on crude oil imports justified including the large, integrated-producers' opposition. Id. at 1355. Noting the discretion given to Commerce in performing its analysis, as well as the lack of an established rule or bright-line test, the Court of International Trade approved Commerce's matrix analysis because it adequately accounted for the particular characteristics of the domestic crude oil industry. Id. at 1355-57.
 
 
 7
 SDO filed a timely appeal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 II
 
 8
 We review decisions of the Court of International Trade reviewing Commerce's CVD and AD determinations by applying "anew" that court's standard of review as set forth in 19 U.S.C. § 1516a(b)(1)(A). PPG Indus., Inc. v. United States, 978 F.2d 1232, 1236 (Fed.Cir.1992). Accordingly, we will uphold Commerce's determination unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(A) (2000). This deferential standard requires only that Commerce "articulate a satisfactory explanation for its action including a `rational connection between the facts found and the choice made.'" Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).
 
 
 9
 Under the statute, CVD and AD investigations may be initiated either by the administering authority (Commerce) or by petition. 19 U.S.C. §§ 1671a (CVD), 1673a (AD).[3] When evaluating whether to initiate such investigations by petition, Commerce must "determine if the petition has been filed by or on behalf of the industry." Id. §§ 1671a(c)(1)(A)(ii)(CVD), 1673a(c)(1)(A)(ii)(AD). To that end, Congress has established specific rules. See id. §§ 1671a(c)(4)(CVD), 1673a(c)(4)(AD). Specifically, Commerce shall find that the industry supports the petition if:
 
 
 10
 (i) the domestic producers or workers who support the petition account for at least 25 percent of the total production of the domestic like product, and
 
 
 11
 (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.
 
 
 12
 Id. §§ 1671a(c)(4)(A)(CVD), 1673a(c)(4)(A)(AD). In determining the level of domestic support, however, Commerce is required to disregard the opposition of domestic producers related to foreign producers, unless those domestic producers can demonstrate that they would be adversely affected by the imposition of duties as domestic producers. Id. §§ 1671a(c)(4)(B)(i)(CVD), 1673a(c)(4)(B)(i)(AD). Also, Commerce may disregard the opposition of domestic producers of a like domestic product who also import the subject merchandise. Id. §§ 1671a(c)(4)(B)(ii)(CVD), 1673a(c)(4)(B)(ii)(AD). The latter sections, dealing with Commerce's discretion to include the opposition of domestic importer-producers, are the focus of our analysis here.
 
 
 13
 On appeal, SDO presents two primary arguments: (1) Commerce improperly departed from its standard practice of disregarding the opposition of domestic importer-producers without reasonable explanation; and (2) Commerce's matrix analysis was arbitrary and capricious, therefore warranting reversal. Appellees[4] disagree with both assertions.
 
 
 14
 * SDO argues that Commerce improperly departed from its prior practice of disregarding the opposition of producers who also import the subject merchandise. In particular, SDO points to Commerce's approach in Frozen Concentrated Orange Juice From Brazil, 52 Fed. Reg. 8324 (Dep't Commerce Mar. 17, 1987) ("FCOJ"), an approach subsequently affirmed by the Court of International Trade in Citrosuco Paulista S.A. v. United States, 704 F.Supp. 1075 (Ct. Int'l Trade 1988). It also maintains that Congress ratified the FCOJ approach in the Uruguay Round Agreement Act's Statement of Administrative Action ("SAA").[5] In FCOJ, SDO points out, Commerce refused to consider the opposition of producers who imported approximately 50% of their production level. Moreover, since then, SDO argues, Commerce has refused to consider the opposition of companies that import as little as 10% to 15% of their production level. See Live Cattle From Canada and Mexico, 63 Fed. Reg. 71,886 (Dep't Commerce 1998) (initiating antidumping investigations) ("Live Cattle"); Dep't of Commerce Mem. From Susan Kuhbach and Gary Taverman to Richard W. Moreland, Petitions on Live Cattle from Canada and Mexico: Determination of Industry Support at 19 (Dec. 22, 1998) ("Live Cattle Mem."). Thus, in considering the opposition of crude oil producers who import between 50% and 100% of their domestic production level, SDO contends Commerce unreasonably and unjustifiably deviated from its standard practice.[6]
 
 
 15
 Appellees counter that the statute itself gives Commerce broad discretion to either include or disregard the positions of domestic importer-producers; there are no conditions, limitations, or qualifications on Commerce's discretion. According to Appellees, Commerce does not have a standard practice of discounting the opposition of domestic importer-producers based on any particular percentage of imports. Instead, Appellees contend that Commerce's prior determinations illustrate a case or industry-specific approach.
 
 
 16
 Our analysis begins with the language of the statute. It states that Commerce "may disregard the position of domestic producers of a domestic like product who are importers of the subject merchandise." 19 U.S.C. §§ 1671a(c)(4)(B)(ii)(CVD), 1673a(c)(4)(B)(ii)(AD) (emphasis added). The legislative history reiterates this point, noting that the provision gives Commerce "the discretion to disregard the position of domestic producers who are also importers of the subject merchandise." S.Rep. No. 103-412, at 36 (emphasis added). Finally, the SAA also evinces Commerce's discretionary authority. It provides that "Commerce will not apply a bright line test to determine whether a producer who is an importer of the subject merchandise ... should be excluded from the domestic industry. Instead, it will look to relevant factors, such as percentage of ownership or volume of imports." SAA, Pub. L. No. 103-465, at 858. Based on the above, we conclude that the statute and related legislative authority grant Commerce discretion in its consideration of the opposition of domestic importer-producers.
 
 
 17
 Despite Commerce's statutory discretion, SDO correctly points out that if Commerce has a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 42, 103 S.Ct. 2856 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."). Thus, the question becomes: (1) whether Commerce has a standard practice of disregarding the opposition of domestic importer-producers whose level of importation surpasses a specific percentage level; and, (2) if so, whether Commerce reasonably departed therefrom in evaluating SDO's petitions.
 
 
 18
 Addressing the first issue, we find that Commerce does not have a standard practice applicable to all industries of disregarding the opposition of domestic importer-producers with import levels beyond a certain percentage. Instead, we agree with the Court of International Trade that the decisions evince the application of an industry-specific analysis. For example, in FCOJ Commerce evaluated the relevant orange juice industry in order to determine whether to disregard the opposition of certain domestic importer-producers. Noting the orange juice industry's reliance on imports, Commerce observed that disregarding all domestic importer-producers' opposition would leave an unrepresentative population for purposes of determining petition support. FCOJ, 52 Fed. Reg. at 8326. Based on an industry-specific analysis, Commerce chose to consider the opposition of those producers importing up to 50% of their domestic production.
 
 
 19
 Performing a similar industry-specific analysis in Live Cattle, Commerce disregarded the opposition of the Texas Cattle Feeders Association ("TCFA") to a petition regarding cattle imports. Live Cattle, 63 Fed. Reg. 71,886. Because over 85% of the cattle imported from Mexico went to Texas feedlots — a significant percentage — Commerce chose to disregard the opposition of the TCFA.[7] Live Cattle Mem. at 19. Commerce concluded that TCFA's members, more than half of which were importers or handlers of Mexican cattle, opposed the petition not as domestic producers, but out of their interests as importers. Id. Notably, in contrast to FCOJ, Live Cattle dealt with a domestic industry having little overall import dependency, of which the TCFA was only a small part. Id. at app. 10, 12. As such, the exclusion of TCFA's opposition did not exclude a disproportionate amount of the domestic industry.
 
 
 20
 Commerce here applied an industry-specific analysis similar to that of FCOJ and Live Cattle. Like FCOJ, but unlike Live Cattle, the domestic crude oil industry relies heavily on imports. In FCOJ, Commerce specifically found that the high import dependency justified including the opposition of domestic producers importing up to 50% of their orange juice production. Here, the import dependency is even higher than in FCOJ, therefore justifying Commerce's inclusion of the opposition of those domestic producers importing even more than 50% of their domestic production. In addition, unlike in Live Cattle, domestic importer-producers in this case account for a large proportion of both the total domestic crude oil production and the opposition to the petition. Therefore, in contradistinction to its determination in Live Cattle, Commerce here reasonably included the opposition of the large, integrated crude oil producers so as to avoid excluding a disproportionate amount of the domestic industry. Finally, Commerce here looked beyond simple import dependency and evaluated additional factors to determine each company's stake in the industry. Because Commerce determined that these other factors were particularly relevant to the crude oil industry, it reasonably considered them in performing its industry-specific analysis, consequently refusing to disregard the opposition of domestic importer-producers with an import dependency of 50% to 100%.
 
 
 21
 In light of our conclusion that Commerce does not have a standard practice of disregarding the opposition of domestic importer-producers based on a specific percentage of imports, it is unnecessary to evaluate whether it reasonably deviated from this practice. Even assuming, however, that Commerce's prior determinations established such a practice, we find that Commerce provided a reasoned analysis that justified considering certain domestic importer-producers' opposition in this case. First, Commerce included the opposition of domestic producers importing between 50% to 100% of their domestic production because of the significant reliance on imports in the crude oil industry. Remand Determination at 20-22. As discussed, this distinction followed the reasoning in FCOJ, but reasonably distinguished that case based on the even higher level of import dependency in the crude oil industry. Id. at 19-20, 22. Second, Commerce's detailed matrix analysis (discussed below), which it used to compare a company's import dependency to its stake in the domestic industry (in order to determine whether to disregard an importer-producer's opposition), was not unreasonable. Rather, it evinces a rational, industry-specific analysis that evaluated relevant extraction-related variables and other economic factors. Thus, even assuming Commerce departed from any common practice of disregarding the opposition of domestic importer-producers importing over 50% of their production, it provided a detailed justification therefore in accordance with Motor Vehicle Manufacturers Ass'n, 463 U.S. at 29, 103 S.Ct. 2856. Consequently, we agree with the Court of International Trade's alternative holding and conclude that even assuming Commerce departed from standard practice, such departure was reasonable.
 
 B
 
 22
 SDO also contends on appeal that Commerce's common stake analysis in its Remand Determination was arbitrary and capricious. Specifically, SDO argues: (1) Commerce arbitrarily performed a country-by-country analysis for each opposing domestic importer-producer; (2) Commerce arbitrarily evaluated each company's stake in the industry; and (3) Commerce arbitrarily considered the amount of crude oil reserves for each company.
 
 
 23
 Appellees disagree. They contend Commerce properly implemented the Court of International Trade's remand instructions, determining each company's stake in the domestic industry and then weighing it against its import dependency. Responding to each of SDO's arguments, Appellees argue: (1) Commerce properly evaluated each country-specific petition individually; (2) Commerce used industry-relevant data in evaluating each company's stake; and (3) Commerce rightfully considered each company's crude oil reserves.
 
 
 24
 Before addressing these questions in detail, we first review Commerce's common stake analysis in more detail. Commerce began its common stake analysis by evaluating each domestic producer's import dependency on a country-by-country basis. Remand Determination at 19-24. It established four separate categories of import dependency: "none" for zero importation; "low" for importation of up to 50% of production; "significant" for imports between 50% and 100% of production; and "high" for imports over 100% of production. Id. at 22. At the same time, Commerce evaluated each producer's stake in the domestic industry, using such factors as production volume, the number of workers employed, the number of new oil wells drilled, the number of wells in operation, and oil-field-related capital expenditures. Id. at 24-27. It also looked at each company's investment risk arising from its U.S. reserve holdings, id. at 26-27, as well as its time horizon — the amount of time it would take to deplete each company's reserves at current production levels. Id. at 27. Commerce subsequently balanced each company's level of importation against its stake in the domestic industry, thereby determining if Commerce could consider that company's opposition. Id. at 27-38. For example, if a company had a "low" import dependency, it needed only a small stake in the domestic industry to have had its opposition counted. Id. at 22-23. If, however, it had a "high" level of import dependency, a company would have had to show a "significant" stake in the domestic industry before Commerce included that producer's opposition. Id. at 23. Although it relied primarily on quantitative data in its analysis, Commerce noted that the final comparison was more qualitative in nature. Id. at 28.
 
 
 25
 * On appeal, SDO argues first that Commerce should not have performed a country-by-country evaluation of whether to disregard a domestic importer-producer's opposition. Particularly, SDO asserts that the only way to gauge a producer's import dependency is by evaluating a company's cumulative imports from all countries subject to investigation. This analysis, SDO maintains, is compelled by the House and Senate Reports accompanying the SAA, both of which discuss "imports" in plural — meaning all imports. In addition, SDO argues Commerce acted arbitrarily in considering a producer's production volume for each country-specific petition, thereby "quadrupling" its value in the analysis and skewing the results. Instead, according to SDO, Commerce should have determined the total dependence on importation by combining imports from all four countries, thereby better capturing each company's import dependency.
 
 
 26
 Appellees counter that the statute requires the evaluation of each petition — and therefore each country — separately. In addition, some of the appellees point out that it is Commerce's established practice to perform a country-specific analysis. As to SDO's assertion of "quadrupling," they also note that the statute specifically calls for a petition-based accounting; therefore, Commerce did not erroneously "quadruple" the reserve values.
 
 
 27
 We conclude that Commerce properly evaluated each of SDO's country-specific petitions individually. The statute governing the petition-based initiation of CVD and AD investigations directs Commerce to investigate petitions individually. With respect to the initial determination on a petition, the statute instructs:
 
 
 28
 Except as provided in subparagraph (B), within 20 days after the date on which a petition is filed under subsection (b), the administering authority shall —
 
 
 29
 . . . .
 
 
 30
 (ii) determine if the petition has been filed by or on behalf of the industry.
 
 
 31
 19 U.S.C. §§ 1671a(c)(1)(A)(CVD), 1673a(c)(1)(A)(AD) (emphases added). Sections 1671a(b)(1) and 1673a(b)(1) similarly request that the parties file "a petition" alleging the elements necessary for imposing either CVDs or ADs, respectively, and also allows for the amendment of "the petition." See id. §§ 1671a(b)(1)(CVD), 1673a(b)(1)(AD). Thus, Commerce acted reasonably in evaluating each petition individually. In contrast, the statute is clear when it requires the cumulation of imports. See id. § 1677(7)(G)(i) (mandating that the United States International Trade Commission cumulate imports for purposes of determining material injury). Given that Congress has not similarly instructed Commerce to cumulate imports to determine industry support for CVD and AD petitions, Commerce could reasonably infer that it would be improper in the absence of such a clear mandate. Accordingly, because SDO filed separate CVD and AD petitions for each country, and because Commerce reasonably evaluated each petition individually, we conclude that Commerce properly engaged in a country-by-country evaluation.
 
 
 32
 In addition, Commerce has previously engaged in a country-specific evaluation of whether it should disregard an importer-producer's opposition to a petition. See Live Cattle, 63 Fed. Reg. 71,886; see also Notice of Initiation of Antidumping Duty Investigations: Sulfanilic Acid From Hungary and Portugal, 66 Fed. Reg. 54,214 (Oct. 26, 2001) (determining that petitions were adequately supported based on an evaluation of separate country-specific Initiation Checklists). For example, in Live Cattle Commerce evaluated domestic support for petitions filed against imports of Mexican and Canadian cattle. Live Cattle Mem. at 19. TCFA members, who opposed the petitions, imported a significant percentage of cattle from Mexico. Id. Consequently, as discussed above, Commerce disregarded their opposition to the petition. Id. With respect to the separate petition for Canadian cattle, however, Commerce considered the TCFA's opposition. Id.
 
 
 33
 The reference to "imports" in plural does not compel a finding otherwise in that the reports themselves contain no indication of whether the use of the plural form "imports" requires consideration of either the sum total of all imports or simply the combined imports from a single country. By itself, the use of the plural form would support either argument. In light of the statutory language discussed above, we find Commerce acted reasonably in considering all the imports from a single country.
 
 
 34
 Finally, a country-by-country analysis is also reasonable. SDO erroneously suggests that the analysis should evaluate imports from all of the countries for which it filed petitions, thereby better capturing the overall import dependency of the domestic crude oil industry. This, however, would distort the statutory purpose by allowing imports from one country to disqualify domestic producers from expressing their opposition to petitions concerning other countries from which they have little or no imports. Moreover, under SDO's proposed reading of the statute, Commerce would theoretically have to proceed differently in, for example, evaluating support for two petitions filed together as compared to two petitions filed separately. Problematically, such a rule could inherently lead to differing and absurd results. Any combined-country analysis would depend in large part on the combination of countries for which a petition was filed. This would allow petitioners to skew the results by strategically selecting a favorable sampling of countries. This possibility reinforces our conclusion that Commerce properly engaged in a country-by-country evaluation of support for SDO's petitions.
 
 
 35
 As for SDO's related arguments concerning the "quadrupling" of the production values in Commerce's country-by-country matrix analysis, we conclude that the statute and prior determinations discussed above compel a different conclusion. While SDO argues that Commerce must effectively cumulate all imports for purposes of initiating multiple-country investigations, the petition-based analysis prescribed by the statute does not bear this out. Accordingly, Commerce did not improperly "quadruple" the reserve values by considering them separately in evaluating support for SDO's various CVD and AD petitions.
 
 
 36
 Because Commerce performed a petition-based, country-specific analysis in accordance with law, its decision was not arbitrary or capricious.
 
 2
 
 37
 SDO further argues that Commerce arbitrarily evaluated each producer's stake in the domestic crude oil industry. Despite the detailed analysis, SDO contends that Commerce only arrived at an unremarkable result: that each of these large entities "has a substantial and long-term stake in the regional crude oil industry." In addition, SDO claims Commerce engaged in the wrong analysis, erroneously evaluating whether the API producers had a stake in the domestic industry as opposed to whether importer-producers "inherently lack the stake in the final investigation being pursued by the petitioner." Citrosuco Paulista, 704 F.Supp. at 1085.
 
 
 38
 Appellees respond that Commerce properly performed the common-stake analysis, as directed by the Court of International Trade. In assessing each company's stake in the domestic industry, Commerce evaluated relevant industry-specific factors, including reserves, reserve depletion rate, and various extraction-related factors (wells, exploration, employees). According to Appellees, these factors were clearly probative of a company's relative stake in the domestic industry. Finally, the government argues that Commerce evaluated the proper stake — a stake in the investigation is indistinguishable from a stake in the domestic industry.
 
 
 39
 We find that Commerce did not arbitrarily focus on extraction-related variables when determining the extent of each importer-producer's stake in the domestic crude oil industry. First, Commerce noted that crude oil is not manufactured, but produced, meaning that a producer's stake can be thought of in terms of factors beyond sheer production levels. Commerce stated:
 
 
 40
 The extractive nature of the crude-oil production process suggests that, in addition to production volume, the size of a company's stake in the domestic crude-oil industry can be thought of in terms of extraction-related variables such as the number of oil-field workers employed, the number of new oil wells drilled, the total number of oil wells in operation, and oil field related capital expenditures.
 
 
 41
 Remand Determination at 18-19. Commerce compiled data on these factors, see id., Annex II, which it legitimately used to determine the extent of each producer's stake in the domestic industry. Second, Commerce also noted that the extractive nature of crude oil production means that many companies hold a stock of reserves. Id. at 26. These reserves pose a significant investment risk arising from movements in the price of crude oil. Id. The larger the holdings, the greater the investment risk. Id. On this basis, Commerce rationally "equate[d] the assumption of investment risk with a stake in the industry." Id. Third, Commerce evaluated the length of a company's time horizon, calculated by dividing the amount of a company's reserves by its annual production volume. Id. at 27. It did so for the purpose of evaluating a producer's commitment to U.S. production over time. Id. The longer the time horizon, the more significant a producer's domestic stake. Id. Commerce articulated clear reasons as to why it considered these various production-related variables and why the particular variables it chose provided relevant data regarding the size of a company's stake in the domestic industry. Because Commerce's logically reasoned and well-researched approach was not arbitrary or capricious, we find it was not in error.
 
 
 42
 Further, we disagree with SDO that Commerce improperly evaluated whether the individual producers had a common stake in the domestic industry rather than in the investigation. This is a purely semantic argument, by which SDO hopes to contort Commerce's use of alternative language into a finding that Commerce engaged in an erroneous evaluation. In addition, SDO's argument is illogical because it suggests that any domestic producer opposing an investigation would implicitly not have a stake therein. The statute, however, specifically allows Commerce to consider the opposition of domestic importer-producers. As a result, we find that Commerce did not erroneously evaluate each producer's stake in the domestic industry rather than in the investigation.
 
 3
 
 43
 As discussed above, Commerce considered each producer's crude oil reserves in determining its respective stake in the domestic industry. Id. at 26. Commerce noted that the extractive nature of crude oil production means that many companies hold a stock of reserves. Id. These reserves pose a significant investment risk arising from movements in the price of crude oil. Id. On this basis, Commerce "equate[d] the assumption of investment risk with a stake in the industry." Id. The larger the holdings, the greater the investment risk. Id. Commerce's analysis, in Annex III of the Remand Determination, calculated the ratio of reserves to the level of imports from each country. It then used this ratio in the final, qualitative weighing of each company's import dependency against its stake in the domestic industry. Id. at 27-38.
 
 
 44
 SDO argues this analysis was in error because it amounted to a bright-line test. SDO points out that Commerce counted the opposition of any producer with reserves more than ten times imports, disregarding the opposition of any producers with a lower ratio. Having provided no rationale for this arbitrary cut-off point, SDO claims Commerce acted arbitrarily. In addition, SDO suggests that the evidence presented by API members did not so clearly demonstrate that the imposition of CVD and AD would decrease world oil prices, and thereby the value of any domestic reserve holdings. SDO contends that this evidence actually reveals that producers were acting out of their interests as refiners and not producers.
 
 
 45
 Appellees respond that Commerce applied no such bright-line test. The quantitative ratios were only used as part of the larger, overall qualitative analysis; they were not applied mechanically.
 
 
 46
 We find that Commerce did not act arbitrarily. Commerce had before it a large body of evidence as to the likely drop in world crude oil prices resulting from the imposition of duties (or even the onset of any CVD or AD investigations). In essence, this evidence demonstrated that the imposition of duties would have flooded the world petroleum market with oil from the exporting countries. Loss of the U.S. market would force those exporting countries to increase their oil production in order to recoup lost sales and find new markets. This increased production would lead to higher supply and lower prices. Consequently, the value of any reserves, as well as, for example, leasehold and equipment leases, would decrease for domestic producers. While SDO argues that the evidence in fact shows the primary interests of the opposing producers are their refining operations, we conclude that, based on the evidence, Commerce's contrary conclusion was not arbitrary.
 
 
 47
 Finally, we note that Appellees argue in the alternative that we should review and sustain Commerce's original Dismissal Determination. In light of our conclusions above that Commerce did not arbitrarily or capriciously dismiss SDO's petitions in its Remand Determination, however, it is unnecessary to address the issue of whether Commerce's original Dismissal Determination should also stand. Thus, we do not reach the issue of whether Commerce must apply a "common stake" analysis, as the CIT directed it to do on remand.
 
 CONCLUSION
 
 48
 Because we find that Commerce properly performed an industry-specific analysis to determine whether to disregard the opposition of domestic importer-producers and, in the alternative, provided a reasonable explanation as to why it departed from its alleged standard practice of disregarding such opposition, we affirm Commerce's dismissal of SDO's CVD and AD petitions. In addition, we find that Commerce properly performed its common stake analysis, comparing each company's import reliance to its stake in the domestic industry.
 
 
 49
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 SDO filed two petitions for each country, one seeking the imposition of AD on imports from that country, the other seeking the imposition of CVD on imports from that country
 
 
 [2]
 American Petroleum Institute
 
 
 [3]
 These statutory provisions codify Congress's enactment of theUruguay Round Agreements Act, Pub. L. No. 103-465, 109 Stat. 4809 (1994).
 
 
 [4]
 We refer to the appellees collectively as "Appellees." Where appropriate, we will distinguish arguments made by a particular appellee or appellees
 
 
 [5]
 Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-826 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, at 822 ("SAA"), accompanying the U.S. legislation implementing the Uruguay Round Agreements, provides "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).
 
 
 [6]
 In calculating the ratio of regional imports to regional production, Commerce arrives at some ratios greater than 100% because those companies are adding to their reserve holdingsSee Administrative Determination Pursuant To Court Instructions: Antidumping and Countervailing Duty Petitions on Certain Crude Petroleum Oil Products from Iraq, Mexico, Saudi Arabia, and Venezuela, nn. 38-43 (Dep't Commerce Aug. 7, 2001) (outlining Commerce's methodology for calculating the ratios of U.S. net imports to U.S. consumption and U.S. net imports to production).
 
 
 [7]
 Although SDO suggests that Commerce thereby disregarded the opposition of producers importing only 10-15% of their inventory, this figure comes from a newspaper article and only applies to one producer. The real level of import dependency inLive Cattle is unclear. See Save Domestic Oil, 240 F.Supp.2d at 1356.