# United States Court of Appeals for the Federal Circuit

05-1030

TIMKEN U.S. COPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

NSK LTD., NSK-RHP EUROPE LTD., RHP BEARINGS LTD.,
NSK BEARINGS EUROPE LTD., and NSK CORPORATION,

Defendants-Appellees,

and

NTN BEARING CORPORATION OF AMERICA, NTN BOWER CORPORATION,
NTN-BCA CORPORATION, and NTN CORPORATION,

Defendants-Appellees,

and

SKF USA INC. and SKF GMBH,

Defendants,

and

FAG KUGELFISCHER GEORG SCHAFER AG,
THE BARDEN CORPORATION (U.K.) LIMITED, THE BARDEN CORPORATION,
FAG ITALIA S.P.A., and FAG BEARINGS CORPORATION,

Defendants-Appellees,

and

KOYO SEIKO CO., LTD. and KOYO CORPORATION OF U.S.A.,

Defendants.

Geert M. De Prest, Stewart and Stewart, of Washington, DC, argued for plaintiff-appellant.  With him on the brief were Terence P. Stewart and William A. Fennell.  Of counsel were Jordan Taylor and Lane S. Hurewitz.

Marc A. Bernstein, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee United States.  With him on the brief were James M. Lyons, General Counsel, and Andrea C. Casson, Acting Assistant General Counsel.

Matthew P. Jaffe, Crowell & Moring, LLP, of Washington, DC, for defendants-appellees NSK Ltd., et al.  With him on the brief was Robert A. Lipstein.

Donald J. Unger, Barnes, Richardson & Colburn, of Chicago, Illinois, for defendants-appellees NTN Bearing Corporation of America, et al.  With him on the brief were Kazumune V. Kano and David G. Forgue.

Mark E. Pardo, Grunfeld, Desiderio, Lebowitz, Silverman and Klestadt LLP, of New York, New York, argued for defendants-appellees FAG Kugelfischer Georg Schäfer AG, et al.  On the brief were Max F. Schutzman, Andrew B. Schroth, and Adam M. Dambrov.  Of counsel was William F. Marshall.

Appealed from:  United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

05-1030

TIMKEN U.S. CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

NSK LTD., NSK-RHP EUROPE LTD., RHP BEARINGS LTD.,
NSK BEARINGS EUROPE LTD., and NSK CORPORATION,

Defendants-Appellees,

and

NTN BEARING CORPORATION OF AMERICA, NTN BOWER CORPORATION,
NTN-BCA CORPORATION, and NTN CORPORATION

Defendants-Appellees,

and

SKF USA INC. and SKF GMBH,

Defendants,

and

FAG KUGELFISCHER GEORG SCHAFER AG, THE BARDEN
CORPORATION (U.K.) LIMITED, THE BARDEN CORPORATION,
FAG ITALIA S.P.A., and FAG BEARINGS CORPORATION,

Defendants-Appellees,

and

KOYO SEIKO CO., LTD. and KOYO CORPORATION OF U.S.A.,

Defendants.

_____

DECIDED: August 31, 2005

_____

Before MAYER, RADER, and DYK, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

Timken U.S. Corporation ("Timken") appeals from the judgment of the Court of International Trade, affirming the determination of the International Trade Commission ("Commission") on the agency record.  <u>Timken U.S. Corp. v. United States</u>, No. 00-08-00385 (Ct. Int'l Trade Aug. 9, 2004).  We conclude that the statutory directive that the Commission address "relevant arguments . . . made by interested parties" is a codification of preexisting standards of judicial review.  We further conclude that the Commission properly considered relevant economic factors in the context of the relevant business cycle.  Because we conclude that the Commission's determination under the relevant standard of judicial review is in accordance with law, not arbitrary or capricious, and supported by substantial evidence, we affirm the judgment of the Court of International Trade.

## BACKGROUND

In 1989 the Commission determined domestic industry was being materially injured by reason of imports of cylindrical roller bearings ("CRBs") being sold at lower than fair value in the United States.  Antidumping duties were accordingly imposed on CRB imports from France, Germany, Italy, Japan, Sweden, and the United Kingdom.

After the antidumping duties were imposed, the performance of the domestic CRB industry underwent a dramatic improvement. In nominal terms, domestic consumption of CRBs more than tripled between 1987 and 1998. Capacity utilization increased and stood at over 80 percent in 1998. The number of production workers more than doubled between 1987 and 1998.

In 1999, the Commission instituted five-year reviews to determine whether the revocation of the antidumping orders would likely lead to a continuation or recurrence of material injury on a domestic industry. In order to revoke the antidumping order, the Commission was required to consider various statutory factors including any likely volume effects, price effects and impact of imports resulting from the revocation. The Commission conducted a full review including a public hearing, allowing interested parties to comment. A wide variety of comments was received.

During the review process, Timken (seeking the continuation of the antidumping duties) urged the Commission to collect data on prices in third-country markets in addition to those in the United States. The Commission asked producers and importers to "compare market prices of cylindrical roller bearings in your home [foreign] market, the United States, and third-country markets, if known." J.A. at 1421.

In their responses to Commission questions, a few interested parties submitted information indicating that prices in the United States market were higher than prices in some third-country markets, though there was no extensive compilation of the prevailing market prices for CRBs in various third-country markets. Based on the limited data tending to show higher United States prices compared to some third-country markets, Timken argued that the revocation of antidumping duties would lead importers to divert

sales of CRBs from third-countries with lower prices into the United States markets, and that the additional imports would then depress prices in the United States. J.A. at 485-86. Timken, among other arguments, also argued that the dramatic improvements in the domestic CRB industry were partly attributable to a favorable upswing in the business cycle of the general manufacturing sector, and that the domestic industry remained at risk of material injury when the business cycle turned downward.

Despite Timken's arguments, the Commission's final determination revoked the antidumping orders on CRBs from France, Germany, Italy, Japan, the United Kingdom, and Sweden. 65 Fed. Reg. 39,925 (June 28, 2000). The Commission found that revocation of the antidumping orders was not likely to result in a significant additional volume of imports because most major subject foreign producers were affiliated with domestic producers and thus were unlikely to increase import volumes or reduce prices to the extent of harming their domestic affiliates, and noted that, despite falling duty rates for the subject countries, imports from subject countries had grown at a slower rate than non-subject imports. Certain Bearings from China, France, Germany, Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom, Nos. AA1921-143, 731-TA-341, 731-TA-343-345, 731-TA-391-397, 731-TA-399 (Int'l Trade Comm'n June 2000) ("Final Determination"). The Commission also found that, in any event, because of the significant growth in demand, "even a different conclusion on likely volume would not lead [it] to reach an affirmative determination regarding likelihood of recurrence or continuation of material injury." Id. at 53 n.371. Additionally, the Commission found no likely significant price effects because of no likely volume effects, and further because prices in the CRB market are less elastic due to

customization and the importance of non-price factors; and that any increase in imports were unlikely to have significant effect on domestic industry given the strong and growing demand for CRBs. Id. at 54. In evaluating the likely price effects upon revocation, the Commission noted the general lack of pricing data. Id. ("The pricing data gathered in the course of these reviews covers very few sales of either domestic or imported CRBs."). The Commission's decision was predicated on a staff report that concluded that the parties were in disagreement as to prices in third-countries, stating the argument that "the evidence regarding whether prices in the United States are higher than elsewhere is controvertible and, in the absence of clear evidence, the Commission should not take this factor into account." J.A. at 349. However, the final determination made no specific mention of third-country prices or their effect on the possibility of foreign producers diverting their product into the United States market. Additionally, the Commission did not address the effects of the business cycle on demand.

Timken filed suit in the Court of International Trade, challenging the Commission's final determination on the bases, inter alia, that the Commission failed to address the evidence of lower third-country prices and that the Commission failed to consider the relevant business cycle. The Court of International Trade rejected the contention that the Commission should have explicitly considered whether third-country prices were lower and, if so, whether that would likely lead to continuation or recurrence of material injury, holding that "[a]lthough the Commission did not explicitly reference each piece of evidence it examined, the Court is satisfied that it considered all the relevant data in rendering the Final Determination." Timken U.S. Corp. v. United States,

310 F. Supp. 2d 1327, 1340 (Ct. Int'l Trade 2004). The court nonetheless remanded to the Commission to reconsider its final determination and "further explain the Commission's findings in the context of the CRBs [sic] business cycle." Id. at 1346.[1]

On remand, the Commission found that although in some industries, "record information about the product at issue indicates well recognized and regular growth cycles, life cycles, or seasonality," the CRB industry did not involve such a product and "we do not find the CRB industry to be characterized by a regular and measurable business cycle." J.A. at 412. The Commission in particular noted that CRBs are used in a wide variety of industries, comprise only a small share of the cost in those industries, and are manufactured for highly specialized uses for which there are few ready substitutes. In light of these factors the Commission concluded that downturns in demand from particular customers or industries would have limited effect on the CRB industry as a whole. Id. The Commission reaffirmed its prior determination, revoking the antidumping orders.

The Court of International Trade affirmed the Commission's remand determination in its entirety. Timken appeals to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

---

[1] The Court of International Trade also remanded to the Commission for its consideration of various other issues not discussed in this opinion.

We review the grant of judgment on the agency record by the Court of International Trade de novo. Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1346 (Fed. Cir. 2005). We apply anew the standard of review applied by the Court of International Trade in its review of the administrative record. Micron Tech., Inc. v. United States, 243 F.3d 1301, 1307-08 (Fed. Cir. 2001). We therefore uphold the Commission's determination unless it was "arbitrary and capricious or unsupported by substantial evidence on the record, or otherwise not in accordance with law." Alloy Piping Prods. v. Kanzen Tetsu Sdn. Bhd., 334 F.3d 1284, 1289 (Fed. Cir. 2003) (internal quotations omitted).

I

Timken's first contention is that the Commission failed to address its argument that third-country market prices were lower than those in the United States and that this provided an incentive for foreign producers to shift exports to the United States.

Section 1677f(i) of Title 19, United States Code, requires that the Commission in antidumping and countervailing proceedings address "relevant arguments." It states:

> the Commission shall include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties who are parties to the investigation or review (as the case may be) concerning volume, price effects, and impact on the industry of imports of the subject merchandise.

19 U.S.C. § 1677f(i)(3)(B) (2000) (emphasis added). The statutory text itself suggests that "relevant arguments that are made by interested parties" are those relevant to

judicial review. However, the parties direct their attention to the accompanying

Statement of Administration Action ("SAA"),[2] which states:

> The Administration does not intend that new section [1677f(i)] alter existing law regarding public notice and explanation of antidumping and countervailing duty determinations. Existing law does not require that an agency make an explicit response to every argument made by a party, but instead requires that issues material to the agency's determination be discussed so that the "'path of the agency may reasonably be discerned'" by a reviewing court. See, e.g., Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (quoting Bowman Transportation v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974)); National Association of Mirror Manufacturers v. United States, 696 F. Supp. 642, 649 (Ct. Int'l Trade 1988). For example, current law requires the Commission to explain its reasoning, and particularly to address the three key factors of volume, price effects and impact, as well as any other relevant factor on which it has relied in its determination. To the extent there is precedent suggesting that the Commission is not required to address even the main arguments of the parties in its opinions, that precedent is disapproved. See, e.g., British Steel Corp. v. United States, 593 F. Supp. 405, 414 (Ct. Int'l Trade 1984).

Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103-316, at 892 (1994) (emphasis added).

Because the SAA states that § 1677f(i) was not intended to alter existing law, it appears logical that the section was designed to codify the preexisting law regarding the requirements of public notice and explanation of agency decisions. The leading decision on the subject at the time and today, though not cited in the SAA, was and is Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29 (1983).[3]

---

[2] By statute, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d) (2000).

[3] Like the present case, State Farm involved a situation where the agency "changed course." The Supreme Court has nonetheless broadly applied State Farm to

Under <u>State Farm</u>, an agency decision is arbitrary and capricious when

> the agency has relied on factors which Congress has not intended it to consider, <u>entirely failed to consider an important aspect of the problem</u>, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>State Farm</u>, 463 U.S. at 43 (emphasis added). Thus in <u>State Farm</u>, the Supreme Court set aside an agency revocation of the standard for mandatory passive restraint devices because the agency had given "no consideration whatever to modifying the Standard to require that airbag technology be utilized." <u>Id.</u> at 46. Further, it is well settled that an agency must explain its action with sufficient clarity to permit "effective judicial review." <u>Camp v. Pitts</u>, 411 U.S. 138, 142-43 (1973). Failure to provide the necessary clarity for judicial review requires the agency action be vacated. <u>Id.</u> at 143.

The cases cited with approval in the SAA are entirely consistent with, and indeed straightforward applications of, the <u>State Farm</u> standard. In <u>Ceramica</u>, this court upheld the International Trade Administration's calculation of benefits under a Mexican government program (for countervailing duty purposes) at the maximum rate, holding that the "ITA gave a full and rational explanation of the basis for its two-tier system," and its "path may reasonably be discerned." 810 F.2d at 1139 (internal quotations omitted); <u>compare</u> <u>State Farm</u>, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotations omitted)). In <u>Mirror Manufacturers</u>, the Court of International Trade was faced with a challenge to a

---

situations not involving reversals of a prior agency positions. <u>See</u> <u>Arkansas v. Oklahoma</u>, 503 U.S. 91, 113 (1992); <u>Bowen v. Am. Hosp. Ass'n</u>, 476 U.S. 610, 626 (1986) (plurality opinion).

05-1030                                        9

negative material injury determination. The court rejected an argument that the Commission erred in focusing on capacity utilization and not discussing other evidence of the effects of imports, holding that "the fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information." Rather, the Commission need only discuss "material issues of law or fact." Mirror Mfrs., 696 F. Supp. at 649. In addition to Ceramica, this court has frequently applied the State Farm standard in reviewing administrative decisions, including antidumping determinations. See, e.g., Save Domestic Oil, Inc. v. United States, 357 F.3d 1278, 1282 (Fed. Cir. 2004); Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1384 (Fed. Cir. 2001); Allied-Signal Aerospace Co. v. United States, 28 F.3d 1188, 1191 (Fed. Cir. 1994).

Timken argues, however, that Congress did more than codify the State Farm standard in § 1677f(i). Timken points to the SAA's statement that, "[t]o the extent there is precedent suggesting that the Commission is not required to address even the main arguments of the parties in its opinions, that precedent is disapproved." Timken submits that this statement is properly understood to reflect a legislative intent to impose a heightened requirement that the Commission explicitly address and refute the arguments made by the interested parties whether or not such action is necessary for effective judicial review under State Farm. That is, according to Timken, "main arguments of the parties" refers not to arguments that are important to the problem to be solved, but to arguments that are emphasized by the parties, and the Commission's failure to comply requires its decision to be set aside. We reject Timken's argument for two reasons.

First, we do not think that the SAA supports Timken's position. The disapproval of "precedent" concerned the Court of International Trade's decision in British Steel. There the court appeared to suggest that only statutorily enumerated factors needed to be considered, stating:

> The statute imposes no requirement on the Commission that it respond to the arguments presented by the parties appearing before it. In the present case, the Court finds that the Commission, notwithstanding that it did not specifically dispose of plaintiffs' arguments, made an adequate statement of reasons in its report <u>that discussed the facts upon which the determination was predicated and that addressed the statutory criteria of injury relied upon</u>. In short, the basis for the Commission's affirmative determination, factually and legally, is clear. The controlling statute does not require more.

593 F. Supp. at 414 (emphasis added). British Steel was a misstatement of State Farm. While a relevant statutory factor is always "an important aspect of the problem" that the Commission is required to consider under State Farm, Pub. Citizen v. Fed. Motor Carrier Safety Admin., 374 F.3d 1209, 1216 (D.C. Cir. 2004), it does not follow that there cannot be important aspects of the problem that are not enumerated in the statute. Thus the disapproval of British Steel does not suggest that the statute was designed to require more than State Farm. In disapproving British Steel, the SAA did no more than reaffirm what State Farm already required.

Moreover, Timken's argument that the statute imposes a heightened requirement beyond what is necessary for judicial review reads an unnecessary contradiction into the SAA. The SAA states that the § 1677f(i) was not intended to change existing law, and quotes the relevant preexisting standard: whether the "'path of the agency may reasonably be discerned' by a reviewing court." For us to agree with Timken's position, we must disregard those portions of the SAA in favor of the single statement that the

Commission is "required to address . . . the main arguments of the parties in its opinions," and hold that this sentence definitively shows § 1677(i) to have in fact changed the law. We do not think that the SAA should be read to contradict itself, especially where, as here, there is an alternative reading that is internally coherent and consistent with long-standing principles of administrative law. See Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law or the general maritime law are to be read with a presumption favoring the retention of long-established and familiar principles."). If a "main argument" is considered to be one pertaining to an "important aspect of the problem" under the State Farm test, the SAA is an accurate, though less than articulate, summary of the preexisting law.

Second, even assuming that Congress intended to incorporate a statutory direction for the Commission to address the arguments emphasized by the parties (even those unnecessary to judicial review), there is still no indication that courts should enforce this additional requirement by invalidating Commission action. Thus, even were Timken to prevail in its interpretation of the SAA and the statute, it could not obtain the relief it seeks.

Not every agency violation of a statutory command results in the sanction of invalidating the agency action taken pursuant to the statute. In the context of statutory time limits for agency action, the Supreme Court has repeatedly held that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." Barnhart v. Peabody Coal Co., 537 U.S. 149, 159 (2003) (quoting United States v. James Daniel Good Real Prop., 510 U.S. 43, 63 (1993)). We applied this principle to

antidumping cases in <u>Kemira Fibres Oy v. United States</u>, 61 F.3d 866, 871-73 (Fed. Cir. 1995) (Commerce's failure to observe regulatory timing requirement did not require that an antidumping finding be revoked).

The principle is not confined to statutory timing provisions, but follows from the principle that courts generally are "most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." <u>Brock v. Pierce County</u>, 476 U.S. 253, 260 (1986). Other circuits have accordingly extended this principle to various procedural requirements. See <u>Elings v. Comm'r</u>, 324 F.3d 1110, 1112 (9th Cir. 2003) (failure to include date for filing petition with Tax Court in notice of deficiency did not invalidate notice); <u>Norwest Transp. Inc. v. Horn's Poultry, Inc.</u>, 23 F.3d 1151, 1154 (7th Cir. 1994) (failure to amend tariff filing to reflect new corporate name did not preclude collecting tariff); <u>Navistar Int'l Transp. Corp. v. U.S. Envtl. Prot. Agency</u>, 858 F.2d 282, 285 (6th Cir. 1988) (missing documents in notice of noncompliance did not invalidate agency action). If Congress intended to go beyond <u>State Farm</u> here, the requirement that the Commission address the parties' main arguments (that is, the arguments emphasized by the parties) is best read as a housekeeping requirement that is not judicially enforceable.

In sum, we think that § 1677f(i) is most properly understood as a codification of the preexisting law as reflected by <u>State Farm</u>. But if the SAA and the statute were read to impose additional requirements, we conclude that Congress did not intend courts to invalidate Commission decisions based on such additional requirements.

II

Applying the State Farm standard, we find that the Commission's decision was not arbitrary or capricious. In its remand determination, the Commission concluded that "[t]here is no basis in the record to conclude that the subject producers will shift their pattern of shipments significantly should the antidumping orders be revoked." J.A. at 405. The Commission staff report noted that "in the absence of clear evidence, the Commission should not take [third-country prices] into account." J.A. at 349. A further comparison between United States prices and third-country prices is not a statutorily mandated factor. Cf. Arkansas v. Oklahoma, 503 U.S. at 113. Nor is it a factor mandated by judicial precedent or long-standing agency precedent that has received judicial endorsement. See Yousefi v. U.S. Immigration & Naturalization Serv., 260 F.3d 318, 329 (4th Cir. 2001) (setting aside agency decision for failing to consider factors enumerated in Matter of Frentescu, 18 I. & N. Dec. 244, 247 (B.I.A. 1982)); cf. Hayes v. Dep't of the Navy, 727 F.2d 1535, 1540 (Fed. Cir. 1984) (agency required to consider relevant factors enumerated in Douglas v. Veterans Administration, 5 M.S.P.R. 280 (1981)).

The Commission urges that its obligation is limited to addressing statutorily enumerated factors. Br. of Commission at 25. This position is untenable; is not consistent with State Farm; and was specifically rejected by the SAA. We nevertheless conclude that, in the circumstances of this case, consideration of third-country prices is not required. Though Timken points to previous instances where the Commission has considered third-country prices, those involved cases where the data was available

through published information or by agreement of the interested parties.[4]  Timken has not shown that sufficiently comprehensive data as to U.S. prices and foreign prices was available in the record so as to enable the Commission to make the comparison.  See Final Determination, at 54.[5]  We conclude that a comparison between third-country prices and United States prices has not been shown to be an "important aspect of the problem" that the Commission was required to consider and address under State Farm.

III

Timken's next contends that the Commission improperly failed to consider the effects of the business cycle.  The statute directs the Commission to consider, inter alia, volume, price, and impact on the industry "within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1675a(a) (2000).

We can discern no error in the Commission's decision.  The Commission inquired as to whether there was a business cycle distinctive to the CRB industry.  It found that the "demand for CRBs is derived from the demand for products incorporating CRBs."

---

[4]  See Steel Concrete Reinforcing Bar from Turkey, No. 731-TA-745 (Feb. 2003); Grain-Oriented Silicon Electrical Steel from Italy and Japan, Nos. 701-TA-355, 731-TA-659, 731-TA-660 (Dec. 2002); Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany, and Italy, Nos. 701-TA-362, 731-TA-707, 731-TA-708, 731-TA-709, 731-TA-710 (June 2001); Ferrovanadium and Nitraded Vanadium from Russia, No. 731-TA-702 (May 2001); Potassium Permanganate from China and Spain, Nos. 731-TA-125, 731-TA-126 (Oct. 1999); Sugar from the European Union; Sugar from Belgium, France, and Germany; Sugar and Syrups from Canada, Nos. 104-TAA-7, AA1921-198-200, 731-TA-3 (Sept. 1999).

[5]  At oral argument, Timken's counsel expressly disavowed any argument that the Commission should have collected more data.  This concession is well-taken as the Commission has considerable discretion in conducting its investigation and collecting data.  See Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1373 (Fed. Cir. 2002).

J.A. at 412. It then determined that CRBs are used in various industries including the automotive, aerospace, steel, paper, food processing, and chemical industries, and concluded that "[g]iven the wide variety of customers and spectrum of different industries for which CRBs are used, we do not find the CRB industry to be characterized by a regular and measurable business cycle." Id. This conclusion is supported by substantial evidence.

Timken also argues that the Commission, instead of inquiring into whether there is a business cycle distinctive to the CRB industry, should have considered the effect on CRB demand from the business cycle of the entire economy. Timken's argument is squarely contradicted by the statute, which unambiguously directs the Commission to consider the business cycle "distinctive to the affected industry." 19 U.S.C. § 1675a(a). There is simply no requirement that the Commission consider the business cycle of the economy as a whole.[6]

## CONCLUSION

We have considered Timken's remaining arguments and find them to be without merit. Accordingly, the judgment of the Court of International Trade is affirmed.

## AFFIRMED

No costs.

---

[6] With respect to both the § 1677f issue and the business cycle issue, we conclude that the statute is unambiguous after employing traditional tools of statutory construction. We therefore need not reach the question of deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 125 S. Ct. 2688 (2005).